1 | **DAVID Z. CHESNOFF, ESQ.**
**RICHARD A. SCHONFELD, ESQ.**
2 | **CHESNOFF & SCHONFELD**
520 South Fourth Street
3 | Las Vegas, NV 89101
Telephone (702) 384-5563
4 | Email: Dzchesnoff@cslawoffice.net
Email: Rschonfeld@cslawoffice.net
5 | Attorneys for Defendant *Morgan Rockcoons*

6 | ### UNITED STATES DISTRICT COURT

7 | ### FOR THE SOUTHERN DISTRICT OF CALIFORNIA

8 | UNITED STATES OF AMERICA,           )

9 |                        Plaintiff,  )

10 | v.                                 )   **CASE NO. 17-CR-03690-AJB**

11 | **MORGAN ROCKCOONS,**              )   **NOTICE OF MOTION AND**
                                          )   **MOTION TO DISMISS**
12 |                        Defendant.  )   **INDICTMENT**

13 | _____  )

14 | TO: ADAM L. BRAVERMAN, UNITED STATES ATTORNEY; AND

15 | JONATHAN SHAPIRO, ASSISTANT UNITED STATES ATTORNEY:

16 | ### I.

17 | ### NOTICE OF MOTION

18 |     PLEASE TAKE NOTICE that on August 21, 2018, at 1:30 p.m., or as

19 | soon thereafter as counsel may be heard, defendant Morgan Rockcoons, by and

20 | through his counsel, David Z. Chesnoff, Esq., and Richard A. Schonfeld, Esq., of

21 | the law firm of Chesnoff & Schonfeld, will ask this Honorable Court to enter an

22 | order granting the Motion to Dismiss Indictment.

1

1       This motion is based upon the papers and pleadings on file herein, the

2   Memorandum of Points and Authorities in support therefor, attached exhibits, and

3   any argument that may be heard.

4       Dated this 20th day of July, 2018.

5                      Respectfully Submitted:

6                      /s/ Richard A. Schonfeld
    **RICHARD A. SCHONFELD, ESQ**

7   **CHESNOFF & SCHONFELD**
    520 South Fourth St.

8   Las Vegas, NV 89101
    (702) 384-5563

9   Email: rschonfeld@cslawoffice.net
    Attorney for Defendant Morgan Rockcoons

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                             2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Introduction

Mr. Rockcoons is charged with two counts in the Indictment filed on November 8, 2017.  Specifically, Mr. Rockcoons is charged with violating 18 U.S.C. § 1960 and 18 U.S.C. § 1956.  Essentially, the government alleges that an undercover agent purchased, for $14,500 in U.S. currency, approximately 9.998 "Bitcoins" from Mr. Rockcoons.  As described below "Bitcoin" is an alleged form of "digital currency" that the government now apparently equates to as United States currency for purposes of seeking to prosecute individuals. *See infra.*

Here, the government's prosecution is also based on the undercover agent allegedly representing to Mr. Rockcoons that said currency used to purchase the Bitcoin was from proceeds of manufacturing and distributing "hash oil" (the government apparently assumes Mr. Rockcoons was aware that the alleged "hash oil" contained tetrahydrocannabinols, an alleged Schedule I Controlled Substance in violation of Title 21 Section 841(a)(1)).  Count 1 alleges a money laundering violation of  18 U.S.C. § 1956(a)(3)(B) and states:

> From on or about December 30, 2016 through on or about January 8, 2017, within the Southern District of California and elsewhere, defendant MORGAN ROCKCOONS, aka "Morgan Rockwell," aka "Metaballo," with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, did knowingly conduct a financial transaction affecting interstate or foreign commerce involving property represented by a law enforcement officer to be the proceeds of specified unlawful activity, to wit, exchanging $14,500 in U.S. currency represented to be proceeds of manufacturing and distributing "hash oil" (an oil containing tetrahydrocannabinols, a Schedule I Controlled Substance) in violation of Title 21, United States Code, Section 841(a) (1), for approximately 9.998 Bitcoins with a then-value of $9,208.62; all in violation of Title 18, United States Code, Section 1956 (a)(3)(B).

3

Count 2 alleges a violation of 18 U.S.C. § 1960(a) and states:

> From a date unknown to the grand jury and through on or about August 30, 2017, within the Southern District of California and elsewhere, defendant MORGAN ROCKCOONS, aka "Morgan Rockwell," aka "Metaballo,"knowingly did conduct, control, manage, supervise, direct, and own at least part of an unlicensed money transmitting business affecting interstate and foreign commerce, which failed to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330, and the regulations prescribed thereunder; all in violation of Title 18, United States Code, Section 1960 (a).

As stated herein, both counts should be dismissed as they fail to state an offense under the facts pled.[1]  As discuss below, Mr. Rockcoons was not engaged in a unlicensed money transmitting business in violation of 18 U.S.C. 1960. Moreover, it is respectfully submitted that Bitcoin is not a "money" proscribed by 18 U.S.C. 1956 or 1960.  As such, both counts in the Indictment should be dismissed.

## II.    Argument

### A.    Legal Standard

Under the Federal Rules, "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." FED. R. CRIM. P. 12(b)(2). Consideration of the motion is typically appropriate if a question of law is involved.  *See United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986).  A district court may make preliminary findings of fact necessary to decide the questions of law presented in the motion, as long as the court's findings do not invade the province of the ultimate fact finder. *See id.*

---

[1] While not alleged in the indictment, the agent apparently represented to Mr. Rockcoons that he wanted to purchase a "butane extractor" from another individual with Bitcoin for purposes of making "hash oil."

1    In addition, FED. R.CRIM.P. 12(b)(3)(B) states that a "motion alleging a
2 defect in the indictment or information" must be made prior to trial, "but at any
3 time while the case is pending, the court may hear a claim that the indictment or
4 information fails to invoke the court's jurisdiction or to state an offense."  Rule
5 7(c)(1) of the Federal Rules of Criminal Procedure also provides that an indictment
6 "must be a plain, concise and definite written statement of the essential facts
7 constituting the offense charged." FED. R. CRIM. P. 7(c)(1).

### B.    Count 2 Should Be Dismissed as Mr. Rockcoons Was Not Engaged in an Unlicensed Money Transmitting Business.

Count 2 alleges a violation of 18 U.S.C. § 1960(a) and states:

> From a date unknown to the grand jury and through on or about August 30, 2017, within the Southern District of California and elsewhere, defendant MORGAN ROCKCOONS, aka "Morgan Rockwell," aka "Metaballo,"knowingly did conduct, control, manage, supervise, direct, and own at least part of *an unlicensed money transmitting business affecting interstate and foreign commerce, which failed to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330*, and the regulations prescribed thereunder; all in violation of Title 18, United States Code, Section 1960 (a).

(emphasis added)

The statute, 18 U.S.C. § 1960, provides, in pertinent part:

> (a) Whoever conducts, controls, manages, supervises, directs, or owns all or part of a business, knowing the business is an illegal money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

> (b) As used in this section—

> (1) the term "illegal money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and—

> (A) is intentionally operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law; **or**

> (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United

5

1    States Code, or regulations prescribed under such section....

2        ...

3  18 U.S.C. § 1960 (emphasis added).

4        Accordingly, the statute makes it a federal crime to knowingly operate a
5  money transmitting business in violation of State law where the State requires a
6  license and makes unlicensed money transmitting punishable as a misdemeanor or
7  felony.  The statute <u>alternatively</u> alleges that a Defendant may be in violation if he
8  fails to comply with the money transmitting business registration requirements
9  under section 5330 of title 31.

10        Here, it is charged that Mr. Rockcoons "knowingly did conduct, control,
11  manage, supervise, direct, and own at least part of an unlicensed money
12  transmitting business affecting interstate and foreign commerce, which failed to
13  comply with the money transmitting business registration requirements set forth in
14  Title 31, United States Code, Section 5330, and the regulations prescribed
15  thereunder; all in violation of Title 18, United States Code, Section 1960(a)".

16        Mr. Rockcoons is not charged with violating California State law because
17  in 2014, California law recognized the use of "digital currencies" for transactions.
18  Specifically, Governor Jerry Brown signed into law, AB 129 which was intended
19  to ensure that "various forms of alternative currency such as digital currency" will
20  be legal in purchasing goods and transmitting payments, according to the bill's text.
21  The bill revised Section 107 of California's Corporations Code that prohibited use
22  of "anything but the lawful money of the United States." ***See* Exhibit 1.**

23        Rather than allege that  Mr. Rockcoons has violated State law, the
24  government has apparently charged him with failing to be licensed as required by
25  31 U.S.C. 5330.

26

27

28                                6

However, 31 U.S.C. 5330 states in part:

(a) Registration With Secretary of the Treasury Required.—
(1) In general.—Any person who owns or controls a money transmitting business shall register the business (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury not later than the end of the 180-day period beginning on the later of—

(A) the date of enactment of the Money Laundering Suppression Act of 1994; or

(B) the date on which the business is established.

(2) Form and manner of registration.—
Subject to the requirements of subsection (b), the Secretary of the Treasury shall prescribe, by regulation, the form and manner for registering a money transmitting business pursuant to paragraph (1).

(3) Businesses remain subject to state law.—

This section shall not be construed as superseding any requirement of State law relating to money transmitting businesses operating in such State.

(4) False and incomplete information.—

The filing of false or materially incomplete information in connection with the registration of a money transmitting business shall be considered as a failure to comply with the requirements of this subchapter.

(b) Contents of Registration.—The registration of a money transmitting business under subsection (a) shall include the following information:

(1) The name and location of the business.

(2) The name and address of each person who—

(A) owns or controls the business;

(B) is a director or officer of the business; or

(C) otherwise participates in the conduct of the affairs of the business.

(3) The name and address of any depository institution at which the business maintains a transaction account (as defined in section 19(b)(1)(C) of the Federal Reserve Act).

7

(4)   An estimate of the volume of business in the coming year (which shall be reported annually to the Secretary).

(5)   Such other information as the Secretary of the Treasury may require.

(c)   Agents of Money Transmitting Businesses.—
(1)  Maintenance of lists of agents of money transmitting businesses.—Pursuant to regulations which the Secretary of the Treasury shall prescribe, each money transmitting business shall—
(A)   maintain a list containing the names and addresses of all persons authorized to act as an agent for such business in connection with activities described in subsection (d)(1)(A) and such other information about such agents as the Secretary may require; and

(B)   make the list and other information available on request to any appropriate law enforcement agency.

(2) Treatment of agent as money transmitting business.—
The Secretary of the Treasury shall prescribe regulations establishing, on the basis of such criteria as the Secretary determines to be appropriate, a threshold point for treating an agent of a money transmitting business as a money transmitting business for purposes of this section.

Importantly, 31 U.S.C. 5330(d) defines "money transmitting business" as follows:

(d) Definitions.—For purposes of this section, the following definitions shall apply:

(1) Money transmitting business.—The term "money transmitting business" means any business other than the United States Postal Service which—

(A)     provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;

(B)  is required to file reports under section 5313; and

(C) is not a depository institution (as defined in section 5313(g)).

8

1    In addition, "Money transmitting service" is defined as follows:

2    (2) Money transmitting service.—

3    The term "money transmitting service" includes accepting
     currency or funds denominated in the currency of any country and
4    transmitting the currency or funds, or the value of the currency or
     funds, by any means through a financial agency or institution, a
5    Federal reserve bank or other facility of the Board of Governors
     of the Federal Reserve System, or an electronic funds transfer
6    network.

7        It has been recognized that a money transmitting business is a business that

8    transmits funds between parties: it receives money from a customer and then

9    transmits that money to a recipient in a place the customer designates. The

10   customer also pays a fee for the service. *See, e.g., United States v. Velastegui*, 199

11   F.3d 590, 592 (2d Cir. 1999);[2] *see also State v. Espinoza*, No. F14-2923, (Fla. 11th

12   Judicial Cir. Ct. July 22, 2016) (citing *Velastegui*); *see also infra*.

13       Here, as described in the Indictment, Mr. Rockcoons was not operating a

14   "money transmitting business."  He was approached by the undercover agent and

15   allegedly sold his own "Bitcoin" for money.  It is clear that under the facts pled,

16   Mr. Rockcoons was not a middle man for anyone.  Rather, it was a two party

17   alleged transaction.

18       The case of *State v. Espinoza*, No. F14-2923, (Fla. 11th Judicial Cir. Ct. July

19   22, 2016) (unpublished decision) is persuasive.  In that case, the defendant was

20   charged with violating Florida criminal statutes violating § 560.125(5)(a), Fla. Stat.

21   Section 560.125(1), (5)(a) and (5)(b) (money services business) as well as

22   §896.101(3)(c), Fla. Stat. (money laundering).

23

24   ───────────────────

25       [2]
     The *Velastegui* court further clarified that the statute does not apply to "an
26   isolated instance of improper transmittal of money." *Velastegui*, 199 F.3d at 595
27   n. 4.

28                                              9

1    Specifically, in *Espinoza*, a detective worked with a Special Agent from the
2    United States Secret Service's Miami Electronic Crimes Task Force to investigate
3    the purchase and sale of bitcoins in South Florida. They began by visiting a
4    peer-to-peer Bitcoin exchange used by potential Bitcoin sellers and buyers. They
5    identified a seller who they thought might be engaged in illegal activity.

6    The detective contacted the seller and arranged a meeting where he
7    purchased 0.40322580 Bitcoins for $500. The seller explained he made a profit by
8    buying and selling Bitcoins. The seller indicated that he would buy at 10 percent
9    below-market prices and sell at 5 percent above-market prices.   The detective
10   arranged a second meeting at which he bought one Bitcoin for $1,000. He also
11   asked the seller if the seller would be willing to accept stolen credit card numbers
12   as payment for bitcoin purchases. The seller did not commit. Through text message
13   communication, the detective purchased another $500 in Bitcoins.

14   The detective arranged a third meeting, this time in a hotel room where the
15   detective told the seller he wanted to buy $30,000 in Bitcoin. He showed the seller
16   a wad of cash. The seller was nervous about accepting the cash and never took
17   possession of it. During that meeting, the seller was arrested and charged
18   with unlawfully engaging in a money services business and money laundering
19   under Florida state law. *See supra*.

20   The seller-defendant filed a motion to dismiss the information.

21   The court dismissed the information various grounds including that Bitcoin
22   was not "money" for purposes of the Florida statutes charging money laundering
23   and engaging in an unlicensed money transmitting business.  A copy of the court's
24   decision is attached hereto as **Exhibit 2**.

25
26
27
28                                          10

The court held that the "[D]efendant's actions do not meet the definition of 'transmit'" for purposes of the money-transmitting business charge.

The court stated:

> Defendant was not a middleman. A money-transmitting business, such as Western Union, fits the definition of "money services business."
>
> For example, Western Union takes money from person A, and at the direction of person A, transmits it to person B or entity B. *See, e.g., U.S. v. Elfgeeh*, 515 F.3d 100, 108 (2d Cir. 2008) (where an FBI agent's testimony in court compared a Hawala to a Western Union because "it's a money transfer operation ... [a] business used to send money from one location to another.")
>
> In this case, the Defendant was a seller. According to the Arrest Affidavit, the Defendant told Detective Arias that he purchases Bitcoin for ten percent (10%) under market value and sells them for five percent (5%) over market value. (Def. Arrest Aff. at 6). The Defendant explained to Detective Arias that this fifteen percent (15%) spread is the method by which the Defendant yields a profit on his Bitcoin transactions. (Det. Arias Dep. 22:6-8, Jan. 13, 2015). The Defendant purchases Bitcoin low and sells them high, the equivalent of a day trader in the stock market, presumably intending to make a profit.
> ...
>
> Thirdly, the State alleges that the Defendant charged a commission or fee for the Bitcoin transaction, and therefore, the Defendant's actions meet the definition of a "money transmitter." Case law requires that a fee must be charged to meet all the elements of being a money transmitting business. "A money transmitting business receives money from a customer and then, *for a fee paid by the customer, transmits that money to a recipient...*" *United States v. Velastegui*, 199 F.3d 590, 592 (2d Cir.1999). (Emphasis added). In the case at bar, the Defendant did not charge a fee for the transaction. The Defendant solely made a profit. In his deposition, Special Agent Ponzi acknowledged as much, noting that the the Defendant made a profit of $83.67 on the $500 Bitcoin sale. (Ponzi Dep. 16:4-25, March 12, 2015). "Commission" is defined as "an amount of money paid to an employee for selling something." Merriam-Webster's Dictionary. (11th ed. 2016). The Defendant was not selling the Bitcoin for an employer. The Defendant was selling his personal property. The difference in the price he purchased the Bitcoin for and what he sold it for is the difference between cost and expenses, the widely accepted definition of profit.
>
> *Id.* at 4-5.

11

1    Similarly, here, Mr. Rockcoons was approached by the undercover and
2    agreed to sell his own Bitcoin. Mr. Rockcoons did not "transmit" the money to
3    another recipient. Moreover, no Bitcoin was transferred through an intermediary.
4    This was a straightforward buyer-seller transaction. The government will
5    acknowledge that Bitcoin is not, in and of itself, illegal. Again, the State of
6    California legalized the use of Bitcoin in 2014 as well.

7    While it is anticipated that the government will argue that Mr. Rockcoons
8    was a Bitcoin "exchanger" and thus was considered a "money transmitter" and was
9    required to register with the Financial Crimes Enforcement Network ("FinCen")
10   under 31 CFR 1010.100(ff)(5), here, Mr. Rockcoons is specifically charged with
11   engaging in "money transmitting" under 18 U.S.C. 1960, and allegedly not being
12   properly licensed under 31 U.S.C. 5330, not 31 C.F.R. § 1010.100(ff)(5).  In
13   addition, 31 C.F.R. § 1010.100(ff)(5) does not specifically mention Bitcoin, and
14   there are clear exceptions under the regulation. Specifically, 31 C.F.R. §
15   1010.100(ff)(5) states:

16   Money transmitter—

17   (i) In general.

18   (A) A person that provides money transmission services. The term
       "money transmission services" means the
19   acceptance of currency, funds, or other value that substitutes for
       currency from one person and the transmission
20   of currency, funds, or other value that substitutes for currency to
       another location or person by any means.
21   "Any means" includes, but is not limited to, through a financial
       agency or institution; a Federal Reserve Bank
22   or other facility of one or more Federal Reserve Banks, the Board
       of Governors of the Federal Reserve System,
23   or both; an electronic funds transfer network; or an informal value
       transfer system; or
24   (B) Any other person engaged in the transfer of funds.
     (ii) Facts and circumstances; Limitations. Whether a person is a
25   money transmitter as described in this section is a
     matter of facts and circumstances. ***The term "money transmitter"***
26   ***shall not include a person that only***:

27

28                                        12

(A) Provides the delivery, communication, or network access services used by a money transmitter to support money transmission services;

(B) Acts as a payment processor to facilitate the purchase of, or payment of a bill for, a good or service through a clearance and settlement system by agreement with the creditor or seller;

(C) Operates a clearance and settlement system or otherwise acts as an intermediary solely between BSA regulated institutions. This includes but is not limited to the Fedwire system, electronic funds transfer networks, certain registered clearing agencies regulated by the Securities and Exchange Commission ("SEC"), and derivatives clearing organizations, or other clearinghouse arrangements established by a financial agency or institution;

(D) Physically transports currency, other monetary instruments, other commercial paper, or other value that substitutes for currency as a person primarily engaged in such business, such as an armored car, from one person to the same person at another location or to an account belonging to the same person at a financial institution, provided that the person engaged in physical transportation has no more than a custodial interest in the currency, other monetary instruments, other commercial paper, or other value at any point during the transportation;

(E) Provides prepaid access; or

(F) Accepts and transmits funds only integral to the sale of goods or the provision of services, other than money transmission services, by the person who is accepting and transmitting the funds.

(emphasis added).

Here, not only does this definition conflict with the definition of "money transmitting business" under 31 U.S.C. 5330(d) and the rule of lenity should be applied, *see United States v. LeCoe*, 936 F.2d 398, 402 (9th Cir. 1991), but at most, under 31 C.F.R. § 1010.100(ff)(5), Mr. Rockcoons acted as a payment processor to facilitate the purchase of a good (butane extractor) as represented by the officer as approved by the fictitious seller, and was integral to the sale of the goods. As such, no matter how the government may try to characterize this transaction, it is respectfully submitted that Mr. Rockcoons was not improperly engaged in the

13

1   illegal "money transmitting business" in violation of 18 U.S.C. 1960.  As such,
2   this count should be dismissed.

3
4
        **C.    The Indictment at Issue Should Be Dismissed as "Bitcoin" is not
               proscribed by 18 U.S.C. 1960 and 18 U.S.C. 1956.**

5           Here, Counts 1 and 2 should respectfully be dismissed as "Bitcoin" is not
6   "money" for purposes of a Section 1956 or 1960 violation.  Specifically, Bitcoin
7   cannot be considered monetary proceeds for purposes of alleged money laundering
8   or a "money transmitting service." As such, both counts should be dismissed.

9           It is important to note that "Bitcoin" was started in 2009 by an individual
10  named Satoshi Nakamoto who by all accounts vanished in 2011.  *See* Kaplanov,
11  Nikolei M., *Nerdy Money: Bitcoin, The Private Digital Currency, And the Case*
12  *Against Regulation*, 25 Loy. Consumer L. Rev. 111, 114 (2012).  The system
13  continues to run on its own despite his apparent absence.  There is no person or
14  entity that continues to run Bitcoin.  As a result, "there is no Bitcoin company to
15  raid, subpoena, or shut down."  *Id.* at 128 (quoting Jerry Brito, Online Cash Bitcoin
16  Could Challenge Governments Banks, Time Techland (April 16, 2011)).

17          Rather, Bitcoin is a decentralized network that relies on transactions
18  conducted over peer to peer network to gain value through demand.  It is not run
19  on a centralized computer.

20          In addition to Bitcoin, there are thousands of other "crypto currencies" that
21  exist.  There are so many of the alleged "crypto currencies" that the Securities
22  Exchange commission recently created a phony crypto currency called, the
23  "HoweyCoin" to show consumers that such "crypto currency" can be false as there
24  is no intrinsic value and it is not backed by any sovereign, including the United
25  States. *See,e.g.*, **Exhibit 3**.

26
27
28                                      14

Furthermore, according to the California State Legislature Assembly Floor Analysis from June 19, 2014:

> Bitcoin has garnered the most attention of any other digital currency, but even for its increasing awareness in the marketplace, many people do not completely understand what it is or how it works. Bitcoin has been called the world's "first decentralized digital currency" and was created in 2009 by a programmer using the alias, Satoshi Nakomoto. The idea behind Bitcoin is that it doesn't have a central clearinghouse or any singular authority and it is not pegged to any real tangible currency. Its value arises from the value that people assign to it. It works via peer-to-peer network where tasks are shared amongst multiple interconnected peers who each make a portion of their resources (computing power) directly available to other network participants, without the need for centralized coordination by servers. The network depends on users who provide their computing power to reconcile transactions and keep the block chain. These users in the system are called "minors" because they can potentially be rewarded for their participation in the network with the creation of Bitcoins. Bitcoins are created (mined) as thousands of dispersed computers solve complex math problems. With the solving of the complete math problem Bitcoins are created. Bitcoin was designed to be a finite resource such as gold or silver, thus the total number that can ever be created is capped at 21 million Bitcoins. It has been estimated that the last .00000001 of a Bitcoin will be "mined" in 2140.

*See* **Exhibit 4.**

Here, it is respectfully submitted that Bitcoin is not "money" for purposes of operating a "money transmitting business". Moreover, Bitcoin is not "money" for purposes of money laundering.

As such, the charges are not properly before this Honorable Court.

This has been recognized not only by the court in *Espinoza*, but in *U.S. v. Petix*, 2016 WL 7017919 (W.D. N.Y. 2016), the government accused defendant Richard Petix of running an unlicensed money transmitting business in violation of 18 U.S.C. § 1960. The financial instrument at the heart of the alleged unlawful business was Bitcoin. Defendant Petix filed a Motion to Dismiss and argued that Bitcoin is private property like precious metals and that he did not operate any business connected to Bitcoin that would fall under Section 1960.

15

1   The Magistrate Judge held oral argument on August 24, 2016, and after
2   considering the parties' arguments and papers including supplemental papers,
3   ultimately recommended granting Defendant Petix's motion to dismiss.[3]

4   The Magistrate Judge found, that Section 1960 does not define the word
5   "money"; and the government acknowledged that "Section 1960 also does not
6   define 'transferring' or 'funds.'" *See* at * 3.

7   Citing  David G. Oedel, *Why Regulate Cybermoney?*, 46 Am. U. L. Rev.
8   1075, 1077 (1997), the court also stated:

> Across all of the legal authorities that make some reference to
> money, and despite new technologies that have emerged over the
> years within the United States monetary system, there has been a
> consistent understanding that money is not just any financial
> instrument or medium of exchange that people can devise on their
> own. "Money," in its common use, is some kind of financial
> instrument or medium of exchange that is assessed value, made
> uniform, regulated, and protected by sovereign power.

*Petix*, 2016 WL 7017919 at * 4.

The Magistrate Judge also analyzed the issues and stated:

> The above context demonstrates that Bitcoin is not "money" as
> people ordinarily understand that term. Bitcoin operates as a
> medium of exchange like cash but does not issue from or enjoy
> the protection of any sovereign; in fact, the whole point of Bitcoin
> is to escape any entanglement with sovereign governments.
> Bitcoins themselves are simply computer files generated through
> a ledger system that operates on block chain technology. See, e.g.,
> Shahla Hazratjee, Bitcoin: The Trade of Digital Signatures, 41 T.
> Marshall L. Rev. 55, 59 (2015) ("The Bitcoin system operates as
> a self-regulated online ledger of transactions. These transactions
> are currently denoted by the change of ownership in Coins. This
> ledger, also referred to as the 'block chain,' has certain built-in
> mechanisms that eradicate the risk of double spending or
> tampering with the master record of all transactions."). Like
> marbles, Beanie Babies™, or Pokémon™ trading cards, bitcoins
> have value exclusively to the extent that people at any given time

---

[3] It appears that Defendant Petix subsequently withdrew his motion after
the government filed an objection.  The court considered the issue moot, and
Defendant Petix subsequently and entered a plea and was sentenced to a term of
probation. *See* Case No. 1:15-cr-00227, ECF 61 and 63.

28   16

choose privately to assign them value. No governmental mechanisms assist with valuation or price stabilization, which likely explains why Bitcoin value fluctuates much more than that of the typical government-backed fiat currency. See, e.g., Jennifer R. Bagosy, Controversial Currency: Accepting Bitcoin As Payment for Legal Fees, Orange County Lawyer, June 2014, at 42 ("Bitcoin has other key features that make it very different from other methods of payment. First, the value of Bitcoin is highly volatile. In January 2013, one Bitcoin was worth about $13. By December 4, 2013, the price had skyrocketed to $1,061 per Bitcoin. By April 15, 2014, the value had dropped to $500 per Bitcoin.") (citation omitted).

*Petix*, 2016 WL 7017919 at * 5.

The Magistrate Judge also found that the term "funds" has already been defined by the United States Supreme Court in *Clark v. Rameker*, 134 S. Ct. 2242, 2246 (2014), and rejected the definitions by the courts in *United States v. Faiella*, 39 F. Supp. 3d 544, 545-46 (S.D.N.Y. 2014), *United States v. Budovsky*, 2015 WL 5602853, at *14 (S.D.N.Y. Sept. 23, 2015), and *United States v. Murgio*, __ F. Supp. 3d __, 2016 WL 5107128, at *3-4 (S.D.N.Y. Sept. 19, 2016), which discussed § 1960 regarding virtual currencies, including Bitcoin.

The Magistrate Judge's well reasoned Report and Recommendation in *Petix* identified that "money" is typically a financial instrument or medium of exchange that is assessed value, made uniform, regulated, and protected by sovereign power, and the whole point of Bitcoin is to escape any entanglement with sovereign governments. The Report and Recommendation also emphasized that the criminal monetary statutes exist in part to protect a uniform, regulated monetary system. The statutes aim to prevent any implicit lending of sovereign power or legitimacy to criminal enterprises. Bitcoin is not regulated by a sovereign power, thus the criminal statutes cannot be said to protect it.

17

The Magistrate Judge in *Petix* also quoted the decision in *State v. Espinoza*, No. F14-2923, (Fla. 11th Judicial Cir. Ct. July 22, 2016) (unpublished decision) where the court stated:

> "Bitcoin may have some attributes in common with what we commonly refer to as money, but differ in many important aspects. While Bitcoin can be exchanged for items of value, they are not a commonly used means of exchange. They are accepted by some but not by all merchants or service providers. The value of Bitcoin fluctuates wildly and has been estimated to be eighteen times greater than the U.S. dollar. Their high volatility is explained by scholars as due to their insufficient liquidity, the uncertainty of future value, and the lack of a stabilization mechanism. With such volatility they have a limited ability to act as a store of value, another important attribute of money."

*See Petix*, 2016 WL 7017919 at * 6.

Just like the Magistrate Judge in *Petix* stated that the defendant could not have violated Section 1960 in its current form, neither should the Defendant in the case at bar. In addition to Count 2, Count 1, the money laundering count, must also be dismissed.  18 U.S.C. 1956 (a)(3)(B) states:

> (3)  Whoever, with the intent—
>
> (B)    to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity;
>
> conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph and paragraph (2), the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

The money laundering statute defines a "financial transaction" as involving, inter alia, "the movement of funds by wire or other means, or [ ] involving one or more monetary instruments, [ ] or involving the transfer of title to any real property, vehicle, vessel, or aircraft." 18 U.S.C. § 1956(c)(4). The term "monetary

18

1   instrument" is defined as the coin or currency of a country, personal checks, bank

2   checks, and money orders, or investment securities or negotiable instruments. 18

3   U.S.C. § 1956(c)(5).

4       Here, as stated above, despite the digital currency being named "Bitcoin",

5   the alleged currency is not a coin backed by any sovereign. The word "coin" is a

6   misnomer. The IRS has also announced that it treats virtual currency as property

7   and not as currency. *See* I.R.S. Notice 2014–21, attached hereto as **Exhibit 5**.

8       As such, because Bitcoin is not a currency backed by a sovereign, including

9   the United States government, and has no intrinsic value, the "money laundering"

10   count, Count 1, should also be dismissed as a matter of law. Specifically, when

11   Defendant allegedly provided the Bitcoin in exchange for the funds, he was

12   provided the Bitcoin which has no intrinsic value and is not backed by a sovereign

13   government. Thus, it is respectfully submitted that Mr. Rockcoons could not have

14   engaged in a financial transaction for purposes of money laundering.

15       Accordingly, the money laundering count should be dismissed as stated

16   herein.

17   **III.   Conclusion**

18       In light of the foregoing, this Honorable Court should dismiss both counts

19   contained in the Indictment.

20       Dated this 20th day of July, 2018.

21                           Respectfully Submitted:

22                           /s/ Richard A. Schonfeld
                            **DAVID Z. CHESNOFF, ESQ.**
23                           **RICHARD A. SCHONFELD, ESQ**
                            **CHESNOFF & SCHONFELD**
24                           520 South Fourth St.
                            Las Vegas, NV 89101
25                           (702) 384-5563
                            Dzchesnoff@cslawoffice.net
26                           rschonfeld@cslawoffice.net
                            Attorneys for Defendant Morgan Rockcoons
27

28                                   19

## CERTIFICATE OF ELECTRONIC SERVICE

The undersigned hereby certifies that she is an employee of the Law Office of Chesnoff & Schonfeld and is a person of such age and discretion as to be competent to serve papers.

That on July 20, 2018, she served an electronic copy of Defendant's Notice of Motion and Motion to Dismiss Indictment by electronic service (ECF) to the person (s) named below:

```
Adam L. Braverman, USA
Jonathan Shaprio, AUSA
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Tel.: (619) 546-6784
jonathan.shapiro@usdoj.gov
```

                                             /s/ Rosemary Reyes
                                             Rosemary Reyes
                                             Employee of Chesnoff & Schonfeld