EXHIBIT 2

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

| | |
|---|---|
| THE STATE OF FLORIDA,<br>*Plaintiff,* | CRIMINAL DIVISION |
| vs. | CASE NO.: F14-2923 |
| | SECTION: 13 |
| MICHELL ABNER ESPINOZA,<br>*Defendant.*<br>_____/ | JUDGE: TERESA POOLER |

### ORDER GRANTING DEFENDANT'S
### MOTION TO DISMISS THE INFORMATION

**THIS CAUSE** came before the Court on Defendant, **MICHELL ABNER ESPINOZA**'s multiple Motions to Dismiss the Information Pursuant to Florida Rule of Criminal Procedure 3.190(c)(4). This Court having reviewed the traverse and responses filed by the State; the arrest affidavit, dated February 6, 2014; the search warrant, filed on February 27, 2014; the deposition of Detective Ricardo Arias, filed on March 5, 2015; the deposition of Special Agent Gregory Ponzi, filed on April 8, 2015; Defendant's Memorandum of Law, filed on June 14, 2016; State's Memorandum of Law, filed on June 16, 2016; the court file; and having held multiple hearings, hereby **FINDS** as follows:

### BACKGROUND

Detective Ricardo Arias is a detective of the Miami Beach Police Department who worked in conjunction with the United States Secret Service's Miami Electronic Crimes Task Force (hereinafter "Task Force"). The Task Force is a team led by the Secret Service that is comprised of state and local agents. Prior to his encounter with the Defendant, Detective Arias attended a meeting at the United States Secret Service relating to virtual currencies. In his deposition, Detective Arias stated that he "became intrigued of the possibility" of initiating a local investigation into virtual currencies. (Det. Arias Dep. 4:18, Jan. 13, 2015). He therefore reached out to Special Agent Gregory Ponzi from the United States Secret Service, which led to the Task Force's investigation into the purchase and sale of Bitcoin in South Florida.

On December 4, 2013, Detective Arias and Special Agent Ponzi accessed the Internet website https://localbitcoins.com seeking to purchase Bitcoin. Localbitcoins.com is a peer-to-peer Bitcoin exchange which defines itself as a marketplace where users can purchase and sell Bitcoin. Users who wish to sell Bitcoin create an advertisement containing the amount of Bitcoin they are offering and their asking price. Potential buyers browse the site and make arrangements to purchase Bitcoin with any seller they choose. The transaction can take place online, or, as in the instant case, the buyer and seller can agree to a local, face-to-face trade.

1

Detective Arias found multiple sellers of Bitcoin on the website, including the Defendant, whose username on the website was "Michelhack." The Defendant advertised that his contact hours were anytime and his meeting preferences were a Starbucks coffee store, internet café, restaurant, mall, or bank. The Defendant's posted advertisement, which Detective Arias found similar to a Criagslist.com advertisement, stated, "You will need to bring your wallet and your smartphone or the address the Bitcoin will be deposited to..." and further specified that interested buyers will have to pay in cash and in person. (*Id.* at 6:23-7:9). Based upon Defendant's username and advertisement, the Task Force determined that the Defendant might be engaged in unlawful activity and decided to initiate a Bitcoin trade with him. Although the Task Force specifically selected to investigate the Defendant, there were no previous reports that the Defendant was engaged in any illicit criminal activity and it appears that the Defendant was selected for the investigation based on his username, his 24-hour availability, and his desire to meet in public places.

On December 4, 2013, Detective Arias, acting in an undercover capacity as an interested buyer, contacted the Defendant by sending a text message to the Defendant's listed phone number. The Defendant responded to Detective Arias and agreed to meet with him the following day. On December 5, 2013, Detective Arias met with the Defendant at a Nespresso Café located at 1105 Lincoln Road, Miami Beach, Florida 33139. At this meeting, the Defendant agreed to sell .40322580 Bitcoin to Detective Arias in exchange for five hundred dollars ($500) in cash. The Defendant also explained to Detective Arias how the Bitcoin market worked, since Detective Arias claimed to be a new-time purchaser and inquired about the process. The Defendant explained to Detective Arias how he made a profit of eighty-three dollars and sixty-seven cents ($83.67) on this sale. Defendant further explained that he purchased the Bitcoin at ten percent (10%) under market value and sold the Bitcoin at five percent (5%) above market value. There was no discussion of illegal activity or stolen credit cards at this meeting. Detective Arias made several comments to the Defendant, none of which amounted to a direct statement that the Bitcoin were to be used for an illicit purpose. Detective Arias made it clear to the Defendant that he wanted to remain anonymous, and that the people he engaged in business with did not accept cash. Thereafter, the Defendant was followed by an undercover surveillance team to Citibank where he later completed the transaction.

On January 10, 2014, Detective Arias contacted the Defendant to arrange a second purchase. Detective Arias purchased one (1) Bitcoin in exchange for one thousand dollars ($1,000) at a Häagen-Dazs ice cream store located in Miami, Florida. At this meeting, Detective Arias told the Defendant that he was in the business of buying stolen credit card numbers from Russians and the Bitcoin would be used to pay for the stolen credit cards. Detective Arias did not show the Defendant any stolen credit cards or credit card numbers. Detective Arias asked the Defendant if the Defendant would be willing to accept stolen credit cards numbers as a trade for Bitcoin in their next transaction and the Defendant allegedly replied that "he would think about it." (Def. Arrest Aff. at 6). Despite the Defendant's purported indecisive response to Detective Arias' illicit proposal, there exists no evidence that the Defendant accepted stolen credit card numbers as payment for any subsequent Bitcoin transaction between the parties.

On January 30, 2014, Detective Arias again contacted the Defendant through a text message to arrange a purchase of more Bitcoin. The entire sale was conducted through text

2

message communication. Detective Arias purchased five hundred dollars ($500) in Bitcoin. The money was deposited into the Defendant's bank account. Detective Arias informed the Defendant through a text message that he wanted to purchase thirty thousand dollars ($30,000) worth of Bitcoin in the future.

On February 6, 2014, Detective Arias met the Defendant with the intent of conducting a fourth Bitcoin transaction in the amount of thirty thousand dollars ($30,000) and effectuating an arrest. The parties met in the lobby of a hotel where the Task Force had a hotel room wired with cameras that was being used for their operation. After a brief meeting in the lobby, Detective Arias brought the Defendant to the hotel room in order to complete the transaction and make the arrest. The meeting in the hotel room was filmed. At this meeting, Detective Arias and the Defendant discussed the illicit credit card operation that Detective Arias had fabricated as part of his cover for the investigation. Detective Arias explained to the Defendant that he was engaged in the activity of buying stolen credit cards wholesale to resell at a higher price. Detective Arias also produced a "flash roll" of hundred dollar bills purportedly containing the thirty thousand dollar ($30,000) payment. The money was in fact undercover funds that were counterfeit. The Defendant inspected the currency and immediately became concerned that the money was counterfeit. The Defendant told Detective Arias he had to take the money to five different banks because he purchased the Bitcoin from five different sellers. According to Detective Arias' deposition, the Defendant wanted to bring portions of the money to the bank "a little at a time" in order to verify its authenticity. The Defendant never took possession of the counterfeit money and was subsequently arrested.

The Defendant was charged with one (1) count of unlawfully engaging in business as a money services business, to wit, a money transmitter, in violation of § 560.125(5)(a), Fla. Stat. (Count I); and two (2) counts of money laundering, in violation of § 896.101(5)(a) and (5)(b), Fla. Stat. (Counts II and III).

On September 17, 2015, the Defendant filed his initial Motion to Dismiss the Information Pursuant to Florida Rule of Criminal Procedure 3.190(c)(4) (hereinafter "Defendant's Motion to Dismiss"). On October 22, 2015, the State filed its Motion to Strike the Defendant's Motion to Dismiss, and on December 4, 2015, the State filed its Second Motion to Strike Defendant's Motion to Dismiss. On December 15, 2015, the Defendant filed his First Amended Motion to Dismiss, and on January 20, 2016, the Defendant filed his Second Amended Motion to Dismiss. On March 3, 2016, the State filed both a Third Motion to Strike Defendant's Motion to Dismiss and a Traverse as to Defendant's Motion to Dismiss-Count One. Both parties submitted Memorandums of Law, filed on June 14th and 16, 2016 respectively.

## I. UNAUTHORIZED MONEY TRANSMITTER

In Count I, the Defendant was charged with violating § 560.125(5)(a), Fla. Stat. Section 560.125(1), (5)(a) and (5)(b) states, in pertinent part, as follows:

> (1) A person may not engage in the business of a **money services business** or deferred presentment provider in this state unless the person is licensed or exempted from licensure under this chapter...

3

(5) A person who violates this section, if the violation involves:
(a) Currency or payment instruments exceeding $300 but less than $20,000 in any 12-month period, commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
(b) Currency or payment instruments totaling or exceeding $20,000 but less than $100,000 in any 12-month period, commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

§ 560.125, Fla. Stat. (Emphasis added).

The State contends that the Defendant is operating as an unlicensed "money services business." Section 560.103(22), Fla. Stat., defines *"money services business"* as a person "who acts as a payment instrument seller, foreign currency exchanger, check casher, or money transmitter." (Emphasis added). The term *"money transmitter"* means "a corporation, limited liability company, limited liability partnership, or foreign entity qualified to do business in this state which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services or other businesses that facilitate such transfer within this country, or to or from this country." § 560.103(23), Fla. Stat.

Initially, the State charged the Defendant as operating a "money services business, to wit a money transmitter." During the course of the last hearing, however, the State orally amended the Information to include a "payment instrument seller." A *"payment instrument seller"* is defined as "a corporation, limited liability company, limited liability partnership, or foreign entity qualified to do business in this state which sells a payment instrument." § 560.103(30), Fla. Stat. A *"payment instrument"* means "a check, draft, warrant, money order, travelers check, electronic instrument, or other instrument, payment of money, or monetary value whether or not negotiable. The term does not include an instrument that is redeemable by the issuer in merchandise or service, a credit card voucher, or a letter of credit." § 560.103(29), Fla. Stat.

When construing the meaning of a statute, the courts must first look to its plain language. Defendant's sale of Bitcoin does not fall under the plain meaning of Section 560.125(5)(a) of the Florida Statutes. Firstly, the Defendant did not receive currency for the purpose of transmitting same to a third party. If one goes by the plain meaning of Section 560.125, Fla. Stat., a "money transmitter" would operate much like a middleman in a financial transaction. The term *"transmit"* means "to send or transfer (a thing) from one person or place to another." Black's Law Dictionary (10th ed. 2014). Defendant's actions do not meet the definition of "transmit." Defendant was not a middleman. A money-transmitting business, such as Western Union, fits the definition of "money services business." For example, Western Union takes money from person A, and at the direction of person A, transmits it to person B or entity B. *See, e.g., U.S. v. Elfgeeh*, 515 F.3d 100, 108 (2d Cir. 2008) (where an FBI agent's testimony in court compared a Hawala to a Western Union because "it's a money transfer operation...[a] business used to send money from one location to another.")

In this case, the Defendant was a seller. According to the Arrest Affidavit, the Defendant told Detective Arias that he purchases Bitcoin for ten percent (10%) under market value and sells them for five percent (5%) over market value. (Def. Arrest Aff. at 6). The Defendant explained

4

to Detective Arias that this fifteen percent (15%) spread is the method by which the Defendant yields a profit on his Bitcoin transactions. (Det. Arias Dep. 22:6-8, Jan. 13, 2015). The Defendant purchases Bitcoin low and sells them high, the equivalent of a day trader in the stock market, presumably intending to make a profit.

Secondly, the Defendant does not fall under the definition of "payment instrument seller" found in § 560.103(29), Fla. Stat. because Bitcoin does not fall under the statutory definition of "payment instrument." The federal government, for example, has decided to treat virtual currency as property for federal tax purposes (See I.R.S. Notice 2014-21, https://www.irs.gov/pub/irs-drop/n-14-21.pdf). "Virtual Currency" is not currently included in the statutory definition of a "payment instrument;" nor does Bitcoin fit into one of the defined categories listed.

Thirdly, the State alleges that the Defendant charged a commission or fee for the Bitcoin transaction, and therefore, the Defendant's actions meet the definition of a "money transmitter." Case law requires that a fee must be charged to meet all the elements of being a money transmitting business. "A money transmitting business receives money from a customer and then, *for a fee paid by the customer,* transmits that money to a recipient..." *United States v. Velastegui,* 199 F.3d 590, 592 (2d Cir.1999). (Emphasis added). In the case at bar, the Defendant did not charge a fee for the transaction. The Defendant solely made a profit. In his deposition, Special Agent Ponzi acknowledged as much, noting that the the Defendant made a profit of $83.67 on the $500 Bitcoin sale. (Ponzi Dep. 16:4-25, March 12, 2015). "Commission" is defined as "an amount of money paid to an employee for selling something." Merriam-Webster's Dictionary. (11th ed. 2016). The Defendant was not selling the Bitcoin for an employer. The Defendant was selling his personal property. The difference in the price he purchased the Bitcoin for and what he sold it for is the difference between cost and expenses, the widely accepted definition of profit.

Nothing in our frame of references allows us to accurately define or describe Bitcoin. In 2008 a paper was posted on the internet under the name Satoshi Nakamoto (thought to be a pseudonym for a person or group of people) which described a way to create a peer-to-peer network for electronic transaction which did not rely on trust. Satoshi Nakamoto, *A Peer-to-Peer Electronic Cash System* (2008). The network came into existence in 2009 when this network created the first block of Bitcoin. Subsequent Bitcoins are created by a process called "mining," essentially a record keeping process. To accrue Bitcoins, the miner must use open source software which allows their computer processors to catch and record peer-to-peer transactions. Bitcoins are bits of data that the miner receives in exchange for the use of their computer processor.

Bitcoin may have some attributes in common with what we commonly refer to as money, but differ in many important aspects. While Bitcoin can be exchanged for items of value, they are not a commonly used means of exchange. They are accepted by some but not by all merchants or service providers. The value of Bitcoin fluctuates wildly and has been estimated to be eighteen times greater than the U.S. dollar. Their high volatility is explained by scholars as due to their insufficient liquidity, the uncertainty of future value, and the lack of a stabilization

5

mechanism. With such volatility they have a limited ability to act as a store of value, another important attribute of money.

Bitcoin is a decentralized system. It does not have any central authority, such as a central reserve, and Bitcoins are not backed by anything. They are certainly not tangible wealth and cannot be hidden under a mattress like cash and gold bars.

This Court is not an expert in economics, however, it is very clear, even to someone with limited knowledge in the area, that Bitcoin has a long way to go before it is the equivalent of money.

The Florida Legislature may choose to adopt statutes regulating virtual currency in the future. At this time, however, attempting to fit the sale of Bitcoin into a statutory scheme regulating money services businesses is like fitting a square peg in a round hole. This Court finds that the Defendant's sale of Bitcoin to Detective Arias does not constitute a "money services business" for all the reasons stated above. The Motion to Dismiss is granted as to Count I.

## II. <u>MONEY LAUNDERING</u>

In Counts II and III, Defendant is charged with money laundering in violation of §896.101(3)(c), Fla. Stat. "Money laundering" is commonly understood to be the method by which proceeds from illicit activity ("dirty money") becomes legitimized. There are numerous ways through which this can occur, but it generally begins with money that is "dirty." The portion of the money laundering statute which the Defendant is charged under is not so straightforward. Section 896.101(3)(c), Florida Statutes, makes it illegal for an individual to conduct or attempt to conduct a financial transaction involving property or proceeds that a law enforcement office has represented came from, or are being used to conduct or facilitate a specified unlawful activity, when the person's conduct is undertaken with the intent to: (1) promote the carrying on of specified unlawful illicit activity; (2) to control or disguise the illicit proceeds, or (3) to avoid reporting requirements. §896.101(3)(c), Fla. Stat. (2016).

The Defendant argues that the money laundering counts should be dismissed because the sale of Bitcoin does not meet the definition of "financial transaction" or "monetary instruments" under §896.101(2)(d) and (e), Fla. Stat. *"Monetary instrument"* is defined as "coin or currency of the United States or any other country, travelers' checks, personal checks, bank checks, money orders, investment securities in bearer form or otherwise in such form that title thereto passes upon delivery, and negotiable instruments in bearer form or otherwise such form that title thereto passes upon delivery." § 896.101(2)(e), Fla. Stat. (2016). "Virtual currency" is not separately included as a category in that definition, nor does Bitcoin fall under any of the existing categories listed.

The definition of "financial transaction" is found in § 896.101(2)(d), Fla. Stat. A *"financial transaction"* is a "transaction… involving one or more monetary instruments, which in any way or degree affects commerce…" If the statute is read to mean that in the transaction, the Defendant must be the party who uses the monetary instruments then the money laundering

statute would not apply in this case, because Bitcoins, as previously discussed, are not monetary instruments.

The more likely interpretation of the statute is that as long as one party to the transaction, in this case the law enforcement officer, is using a monetary instrument, a financial transaction has occurred. Therefore, any sale of property for cash is a financial transaction. Potentially any sale of property for cash could be a violation of the money laundering statute.

In this case, Detective Arias did not represent that the cash was the proceeds of an illegal transaction. Detective Arias did represent to the Defendant, in so many words, that he was planning to trade what he was buying from the Defendant (Bitcoin) for stolen credit card numbers. The statute requires that the officer as buyer merely make the representation that what was in this case, legally purchased Bitcoin is being used to facilitate or conduct illegal activity; it does not require any affirmative acknowledgement or action from the seller. Presumably the officer/buyer would be using the stolen credit cards to further engage in some kind of identity theft or fraudulent purchases, though they did not make this clear.

The statute does go on to require that the Defendant charged under this statute undertake the transaction with the **intent** to promote the carrying on of the illegal activity (Sections B and C do not apply here). § 896.101(3)(c)1, Fla. Stat. (2016). The usage of the word "promote" in § 896.101(3)(c)1 is troublingly vague. It is not clear to this Court what conduct is proscribed and what conduct is permitted. The term *"promoter"* is defined in Black's Law Dictionary as "someone who encourages or incites." Black's Law Dictionary 1333 (10th ed. 2014). The term *"incite"* is defined in Merriam-Webster Dictionary as "to cause (someone) to act in an angry, harmful, or violent way." Merriam-Webster's Dictionary (11th ed. 2016). The term *"encourage"* is defined as "to make (something) more appealing or more likely to happen." *Id.* Is it criminal activity for a person merely to sell their property to another, when the buyer describes a nefarious reason for wanting the property? Does "promoting" require that there be more of an affirmative act or does the mere act of selling constitute promoting? Has a seller crossed into the realm of "promoting" by virtue of simply hearing the illicit manner in which the buyer intends to use what's been purchased? There is unquestionably no evidence that the Defendant did anything wrong, other than sell his Bitcoin to an investigator who wanted to make a case. Hopefully, the Florida legislature or an appellate court will define "promote" so individuals who believe their conduct is legal are not arrested.

This Court is unwilling to punish a man for selling his property to another, when his actions fall under a statute that is so vaguely written that even legal professionals have difficulty finding a singular meaning. Without legislative action geared towards a much needed update to the particular language within this statute, this Court finds that there is insufficient evidence as a matter of law that this Defendant committed any of the crimes as charged, and is, therefore, compelled to grant Defendant's Motion to Dismiss as to Counts II and III.

WHEREFORE, it is **ORDERED AND ADJUDGED** that the Motion to Dismiss the Information is hereby **GRANTED**.

**DONE AND ORDERED** at Miami, Miami-Dade County, Florida, this 22 day of July, 2016.

TERESA POOLER
Circuit Court Judge

**Copies Furnished to:**
Mr. Frank Andrew Prieto, Esq., *Attorney for the Defendant Michell Abner Espinoza*, 1 Northeast 2nd Avenue, Suite 200, Miami, Florida 33132
Mr. Thomas Haggerty, Esq., *Assistant State Attorney*, State Attorney's Office, 1350 N.W. 12th Avenue, Miami, Florida 33136