ADAM L. BRAVERMAN
United States Attorney
JONATHAN I. SHAPIRO
Assistant U.S. Attorney
California Bar No.: 268954
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-8225
Email:  jonathan.shapiro@usdoj.gov

Attorneys for the United States

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MORGAN ROCKCOONS,<br><br>Defendant. | Case No.  17CR3690-AJB<br><br>UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT:<br><br>Date:   August 21, 2018<br>Time:   1:30 p.m. |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Adam L. Braverman, United States Attorney, and Jonathan I. Shapiro, Assistant United States Attorney, and hereby files its Response in Opposition to Defendant's Motion to Dismiss the Indictment.

**I.**

**STATEMENT OF THE CASE**

On November 8, 2017, Morgan Rockcoons ("Defendant") was indicted by a federal grand jury for (i) money laundering, in violation of Title 18 U.S.C. § 1956(a)(3)(B); and (ii) operating an unlicensed money transmitting business, in violation of Title 18 U.S.C. § 1960(a).  Defendant was arrested on February 9, 2018, in the District of Nevada, and he was arraigned on the indictment on February 22, 2018.

On July 20, 2018, Defendant filed a Motion to the Indictment.  The United States hereby files its Response and Opposition.

## II.

## BACKGROUND

### A.      Statutory and Regulatory Framework

Title 18, United States Code, Section 1960 was created as part of an anti-money laundering effort, "designed to prevent the movement of funds in connection with drug dealing." United States v. Faiella, 39 F. Supp. 3d 544, 545-46 (S.D.N.Y. 2014) (quoting United States v. Bah, 574 F.3d 106, 112 (2d Cir. 2009)).  Originally enacted via the Annunzio-Wylie Anti-Money Laundering Act, Pub. L. No. 102-550, § 1512, 106 Stat. 3672, 4057-58 (1992), the statute's current form (as charged in Count Two) came through the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 (hereinafter "the Act"), in the aftermath of the September 11, 2001, terrorist attacks on the United States.  See USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115 Stat. 296, 339.  According to the House Committee on Financial Services report on the bill that would be incorporated into the Act, the purpose of the Act was to "provide[] the United States government with new tools to combat the financing of terrorism and other financial crimes." H.R. Rep. No. 107-250, at 33 (2001).  The following was cited as among the need for legislation:

> Despite evidence suggesting [Osama] Bin Laden and Al Qaeda utilize formal banking relationships as part of their global financial network, experts believe that a major share of terrorist financing is conducted through international cash couriers as well as through informal banking systems, like the ancient South Asian money exchange system called hawala. The latter consists of an international network of non-bank financial agents, often built on trusted family or cultural relationships. In most cases, the funds themselves are never transferred, just messages relating to receipt or disbursement of funds. These underground systems are exploited by terrorists and other financial criminals because of the lack of record-keeping and opportunity for anonymity.

*United States' Response in Opposition to Defendant's Motion to Dismiss Indictment*

*17CR3690-AJB*

Id. at 34.  Thus, the Act amended numerous statutes, including § 1960, to help identify, trace, and track the flow of illicit wealth, both derived from and intended to promote unlawful activity, through informal funds transfer systems.

Section 1960(b)(1) defines an "unlicensed money transmitting business" as a money transmitting business which affects interstate or foreign commerce in any manner or degree and which satisfies one of three additional requirements (only one of which involves a license).  The applicable requirement in this case is § 1960(b)(1)(B), that the business failed to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330 or regulations prescribed thereunder.  Section 1960 does not define "business," but defines "money transmitting" to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  See § 1960(b)(2).  Section 1960 also does not define "transferring" or "funds."

As referenced in § 1960(b)(1)(B), § 5330 governs the registration of money transmitting businesses with the Secretary of the Treasury.  See § 5330(a)(1).  Under § 5330(d), a "money transmitting business" includes any "person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system," and is required to file reports under section 5313, and is not a depository institution.

Section 5313 governs the filing of reports on domestic coins and currency transactions.  Under § 5313(a):

> When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the

transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.

Under § 5312(a)(2)(R), a domestic financial institution includes any "person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system." This portion of the definition for a domestic financial institution under § 5312(a)(2)(R) is identical to the above-excerpted definition for a money transmitting business under § 5330(d). Thus, any such business would trigger the reporting duty under § 5313 "if, when, and as the transmitter does engage in currency transactions." United States v. E-Gold, Ltd., 550 F. Supp. 2d 82, 95 (D.D.C. 2008).

Applicable regulations prescribed under § 5330 are at Title 31, Parts 1010 and 1022 of the Code of Federal Regulations. 31 C.F.R. § 1010.11(ff) and (ff)(5)(A) define a "money services business" to include a "person wherever located doing business, whether or not on a regular basis or as an organized or licensed business concern," who "provides money transmission services." Such services means "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." See § 1010.11(ff)(5)(A). Such money services businesses must register with FinCEN. See § 1022.380(a). Failure to register is criminally punishable under 18 U.S.C. § 1960. See § 1022.380(e). Such money services businesses must also file currency transaction reports under various circumstances outlined in the regulations. See §§ 1022.300, et seq.

Bitcoin exchangers doing business in the United States are considered money transmitters under federal anti-money laundering ("AML") regulations and are required to register with the Financial Crimes Enforcement Network ("FinCEN"). See 31 C.F.R. § 1010.100(ff)(5); see also FinCEN, Guidance on the Application of FinCEN's

*Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, March 18, 2013, FIN-2013-G001, at 4-5, *available at* http://www.fincen.gov/statutes_regs/guidance/pdf/FIN-2013-G001.pdf ("FinCEN Guidance").

## B. Overview of Bitcoin

Commonly called a virtual currency, bitcoin is an electronic medium of exchange that exists as entries on a distributed "blockchain" ledger. This blockchain records all bitcoin transactions ever "made" by documenting, among other data, the number of bitcoins transferred from one "public address" to another. A public address is an alphanumeric string that bears no identifiers for who "controls" it. It is somewhat analogous to a bank account number, but with at least one crucial distinction in practice: A bank account number is useless unless paired with a routing number that identifies the financial institution that services the account, which in turn can identify the account holder. A bitcoin public address is not, by design, hitched to a comparable source of identification, and thus tends to anonymize its use.

Bitcoin is not known to be created by any sovereign state, nor are bitcoins issued as legal tender. Bitcoins are "mined" when the blockchain is updated by "miners" who provide the computing power to "confirm" new bitcoin transactions. The bitcoin program pays out a miner's fee in bitcoins for new transactions that are recorded on the blockchain, which is then updated for all bitcoin users.

Bitcoin is a "convertible" virtual currency. It has an equivalent value in fiat currency, acts as a substitute for fiat currency, and can be exchanged for fiat currency. The exchange rate for bitcoin is not determined by any authority or entity, for example, in the way that the Chinese yuan was once "pegged" at 8.28 to the United States dollar.[1] Rather, the value of the bitcoin is determined on the open market, with a "floating"

---

[1]   Peter S. Goodman, China Ends Fixed-Rate Currency, Wash. Post, July 22, 2005, at http://www.washingtonpost.com/wp-dyn/content/article/2005/07/21/AR20050721003-51.html (last visited Dec. 14, 2016).

exchange rate like many fiat currencies. For example, on January 8, 2017, when Defendant transferred bitcoin to the undercover agent in this case, one bitcoin had the equivalent value of about $921. As of the date of this filing, one bitcoin has the equivalent value of about $7,101.

A bitcoin is "possessed," that is, control over it is exercised, by whoever possesses the corresponding private key that is necessary to transfer bitcoins at a public address. Bitcoin users generally maintain these public-private key combinations in virtual "wallets." These wallets are not limited to a single public address; a wallet's owner can change the public address with every transaction. Therefore, no record of transactions associated with a particular wallet, and no pattern of transactions that may tend to identify the wallet's owner, can be readily gleaned from the blockchain alone. This decentralized system for maintaining bitcoins and bitcoin transactions affords users less traceability and greater anonymity than traditional methods of transmitting money.

These characteristics have popularized the use of bitcoin in certain contexts, including various Internet-based markets. Vendors on a succession of "dark net" markets such as Silk Road, Agora, and AlphaBay Market offer a broad selection of goods and services. For example, a March 2016 perusal of AlphaBay Market revealed 15,737 listings under the category "Fraud" and 74,105 listings under "Drugs & Chemicals." Commerce on these markets is widely conducted through payment in virtual currencies; bitcoin is a preferred and sometimes sole method of payment accepted on leading dark net markets. Customers turn to bitcoin exchangers to transfer funds from the physical world as fiat currency to the virtual world as bitcoins. Vendors who receive payment in bitcoins also turn to bitcoin exchangers to convert the bitcoins back to fiat currency. In "selling" bitcoins to the customers, who pay the bitcoins to the vendors, who then "cash out" the bitcoins, these exchangers or series of exchangers effectively "recirculate" the virtual currency that makes this commerce flow. Count

Two of the Indictment charges the defendant for his conduct as a bitcoin exchanger in this shadow financial system.

## III.

## STATEMENT OF FACTS

### A.   Identification of Defendant

In September 2015, Homeland Security Investigations (HSI) learned that San Diego-based bitcoin exchangers were advertising their services on the website LocalBitcoins.com.  The most prolific San Diego-based seller at the time went by the nickname "Metaballo," and advertised his services as both a trader and a seller of bitcoin.

HSI reviewed Metaballo's website and found Facebook pages for Kinetics.cc and Metaballo.  The Kinetics Facebook page included a post, dated July 11, 2014, which read:

> "Dear Bitcoin community, my name is Morgan Rockwell, I am CEO of Bitcoin Kinetics Inc.  I created the first Bitcoin operated service machine to allow Bitcoin to be used in the real world in all machines and businesses.  We are rapidly expanding and growing into new territories, industries into a competitive and profitable environment."

Metaballo's Facebook page included posts identifying Defendant as "Morgan Rockwell."  This Facebook page also contained a post, dated January 15, 2014, stating "Metaballo on LocalBitcoins.com buy and sell bitcoins with trader Metaballo."

In April 2016, Defendant's LocalBitcoins.com profile showed that he continued to advertise as a trader and seller of bitcoin in San Diego, with his profile reflecting that he had engaged in more than 500 transactions, describing him as a professional trader. As of October 2017, Defendant's profile indicated that he conducted more than 1,000 bitcoin trades with more than 644 people.

*United States' Response in Opposition to Defendant's Motion to Dismiss Indictment*                                      *17CR3690-AJB*

In September 2015, April 2016, and again in August 2017, HSI confirmed that neither Defendant nor any of his companies were registered as a money services business with FinCEN or the State of California.

**B.   <u>Undercover Investigation</u>**

In December 2016, an undercover officer (UCO) (known to Defendant as "Nima") left a voice message with Defendant (at the number posted by Defendant on LocalBitcoins.com) requesting his service in exchanging cash to bitcoin. In subsequent text message conversations, Defendant explained to the UCO that Defendant was aware of and followed anti-money laundering and know your customer requirements. Defendant also informed the UCO of the currency transaction reporting requirement, stating that if the UCO engaged in a transaction in excess of $10,000 USD cash, information on the UCO would have to be obtained. In the course of this early exchange of text messages with the UCO, Defendant provided the UCO with Defendant's full name as "Morgan Rockwell," and further provided his "legal name" as "Morgan Rockcoons." Defendant also provided the UCO with Defendant's LocalBitcoins.com profile as proof that Defendant exchanged between 30 and 60 bitcoins per week.

In a text message, the UCO informed Defendant that the UCO was engaged in the manufacture of butane hash oil. The UCO informed Defendant that the cash was being exchanged to bitcoin to buy an extraction device, which would be used to manufacture hash oil. In text messages, Defendant made statements to the UCO that indicated that Defendant was knowledgeable about butane hash oil. Defendant also told the UCO that Defendant operated a business engaged in the sale of marijuana and hash oil in San Francisco. Defendant offered to assist the UCO in selling hash oil manufactured by the UCO, via Defendant's business. Defendant wrote to the UCO that Defendant wanted to be the "Steve Jobs of cannabis and bitcoin," and that he had provided currency exchange services to other marijuana industry individuals and entities.

*United States' Response in Opposition to Defendant's Motion to Dismiss Indictment*                                          *17CR3690-AJB*

In a text message, the UCO told Defendant that, because the UCO was engaged in the manufacture and sale of hash oil, the UCO did not want to provide any identifying information. Defendant responded that he understood and suggested that the UCO could break up the transaction over two days, each transaction being less than $10,000 USD, to avoid the reporting requirement.   Defendant later completely abandoned the requirement of making the UCO break up the transaction into two separate transactions, accepting all $14,500 from the UCO in one transaction, and not requiring any identifying information from the UCO.

The UCO and Defendant discussed via text messages various options for providing the cash to Defendant, including structuring Western Union money transfers, structuring the purchase of money orders, and structuring the deposit of cash into one of Defendant's bank accounts.   Ultimately, Defendant and the UCO agreed that the UCO would send the cash via FedEx to Defendant.   Defendant specifically gave the UCO a series of suggestions on how to conceal the cash in the package to avoid detection.

On December 30, 2016, the UCO sent Defendant $14,500 USD cash concealed in a FedEx package for the purpose of Defendant exchanging it to bitcoin.   On January 3, 2017, the package was delivered to Defendant, which Defendant confirmed to the UCO via text message. On January 8, 2017, Defendant transferred 9.998 bitcoins to the UCO, with an equivalent value of $9,208.62, keeping a fee of $5,291.38 (more than thirty-six percent).

## IV.

## ARGUMENT

Defendant has moved to dismiss both counts of the indictment, arguing that they fail to state an offense under the facts pled.   But an indictment need only "be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "An indictment is sufficient if it (1) contains

*United States' Response in Opposition to Defendant's*
*Motion to Dismiss Indictment*                                                    *17CR3690-AJB*

the elements of the offense charged and fairly informs a defendant of the charge against him which he must defend and (2) enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." United States v. Lazarenko, 564 F.3d 1026, 1033 (9th Cir. 2009) (internal quotation marks omitted). "Generally, an indictment is sufficient if it sets forth the elements of the charged offense so as to ensure the right of the defendant not to be placed in double jeopardy and to be informed of the offense charged." United States v. Rodriguez, 360 F.3d 949, 958 (9th Cir.2004) (internal quotation marks omitted).

Put another way, an indictment will be sufficient if it tracks the language of the statute constituting the offense, and "'so long as the words unambiguously set forth all the elements of the offense.'" United States v. Davis, 336 F.3d 920, 922 (9th Cir. 2003) (citing United States v. Fitzgerald, 882 F.2d 397, 399 (9th Cir.1989).

Thus, a defendant may challenge the sufficiency of an indictment before trial. Fed. R. Crim. P. 12(b)(3)(B). However, such a challenge is limited to the four corners of the indictment. United States v. Boren, 278 F.3d 911, 914 (9th Cir.2002). The indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." United States v. King, 200 F.3d 1207, 1217 (9th Cir. 1999).

A.    **The Indictment Alleges that Defendant was a "Money Transmitting Business**

As required under Ninth Circuit authority, Count 2 tracks the language of the criminal statute as issue – Section 1960(b)(1)(B) – by alleging that Defendant "knowingly did conduct, control, manage, supervise, direct, and own at least part of an unlicensed money transmitting business affecting interstate and foreign commerce, which failed to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330, and the regulations prescribed thereunder." That is all that is required, because under Ninth Circuit law, the Indictment need not set forth the particulars of how a defendant committed the offense. See F

*United States' Response in Opposition to Defendant's*
*Motion to Dismiss Indictment*                                                                     *17CR3690-AJB*

<u>Fitzgerald</u>, 882 F.2d at 399 (rejecting defendant's argument that the lack of factual allegations was fatal to the indictment).

The crux of Defendant's argument on this point seems to be that Section 1960 requires that the Indictment allege that Defendant transmitted bitcoins to a recipient in a place the customer designated for a fee. (MTD Br. 9). This argument fails for a number of reasons. First, because the Indictment alleges that Defendant was an "unlicensed money transmitting business" as set forth in Section 1960(a), including by failing to comply with the requisite "registration requirements under Section 5330 of Title 31, United States Code, or the regulations prescribed under such section," <u>see</u> 18 U.S.C. § 1960(b)(1)(B), the Indictment is sufficiently pled as a matter of Ninth Circuit law.

Second, Defendant's argument ignores the facts of this case. The government expects that the evidence at trial will demonstrate that, based on Defendant's admission, his sole source of income for the past nine years has been from fees charged for the buying and selling of bitcoin for different customers. Defendant estimated that he had conducted transactions with third parties totaling 10,000 bitcoins. As noted above, just looking at Defendant's single transaction with the undercover agent, Defendant charged a fee of $5,291.38 (more than 36%). And after receiving the cash from the undercover agent, Defendant sent bitcoin from Defendant's wallet to a different bitcoin wallet, a wallet that was represented to be controlled by a person selling an extraction device used in the production of hash oil.

Third, and perhaps most importantly, Defendant is trying to insert into the law an element that is just not there, that is, a requirement that in order to be deemed a money transmitting business, one must act as "middleman" between two distinct parties. Under 31 U.S.C. § 5330(d), a "money transmitting business" includes "any other person who engages as a business in the transmission of funds . . . ." As detailed above, Defendant transmitted bitcoin, and as discussed below, bitcoin is "funds" within the purview of section 1960.

**B.** **Congress wrote § 1960 to apply broadly, and for the term "funds" to include virtual currencies such as bitcoin.**

Defendant argues that bitcoin falls outside the scope of section 1960 because virtual currencies, including bitcoin, do not constitute either "money" or "funds" under the statute. Aside from making a passing reference to <u>State v. Espinoza</u>, a Florida state case arising under a Florida state law not at issue in this case, Defendant's argument relies solely on the magistrate judge's Report and Recommendation in <u>United States v. Petix</u>. Significantly, the district judge presiding over the <u>Petix</u> case rejected Magistrate Judge Scott's Report and Recommendation:

> We have the issue of the R & R. As I told you before, we went through some of the cases, and I talked about the weight of authority. In other words, cases from other jurisdictions and other judges who went against what Judge Scott said. And I said that I believe the weight of authority is contrary to what Judge Scott determined. And since it's on appeal to me as a district judge, I have to review everything de novo and make a decision. Now, I'll render a written decision, as I said, but I'm just saying, I believe the weight of the authority is correct and Judge Scott should not have granted a motion to dismiss the second count of the indictment, okay?

(<u>United States v. Petix</u>, crim. case no. 15cr227A, W.D.N.Y., ecf docket no. 79 (transcript of April 6, 2017 hearing ) at p. 4).    After the district judge stated his disagreement with the magistrate judge's Report and Recommendation, the defendant in that case orally withdrew his motion to dismiss, (<u>id.</u> at pp. 5-6), and ultimately pleaded guilty.  Indeed, as discussed below, every federal court to have examined this argument in the context of Section 1960 (and Section 1956, the money laundering statute), has rejected it. This Court should do the same.

Section 1960 broadly defines "money transmitting" to include "transferring *funds on behalf of the public by any and all means*." 18 U.S.C. § 1960(b)(2) (emphasis added). Because the statute does not specifically define the term "funds," the term is given its ordinary meaning. See Taniguchi v. Kan Pacific Saipan, Ltd., 132 S. Ct. 1997, 2002 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."). In common parlance, "funds" is a flexible term encompassing virtually any liquid form of value. The Oxford English Dictionary, for example, defines "funds" to mean "money at a person's disposal; pecuniary resources." Oxford English Dictionary (2d ed. 1989). The term "pecuniary" is defined in turn as "of or relating to money; monetary; financial." *Id.* Other dictionaries provide similarly broad definitions. See, e.g., Random House Dictionary (4th ed. 2001) (defining "funds" as "money immediately available; pecuniary resources"); Merriam-Webster Online, http://www.merriam-webster.com/dictionary/fund (last visited June 29, 2016) (defining "funds" as "available pecuniary resources," and "fund" as "available money" or "an amount of something that is available for use: a supply of something"); see also Black's Law Dictionary 743 (9th ed. 2009) (defining "fund" as "a sum of money or other liquid assets established for a specific purpose," and further defining "money" as "[a]ssets that can be easily converted to cash.").

Relying on these definitions, courts have consistently concluded that Section 1960 applies not just to traditional currencies, but also to virtual currencies, including bitcoin, because virtual currencies constitute "funds." Beginning in 2007, e-Gold, an

13

issuer of digital currency known as "e-gold," was charged with, *inter alia*, operating an unlicensed money transmitting business in violation of Section 1960(b)(1)(B). *See* United States v. E-Gold, Ltd., 550 F. Supp. 2d 82, 82 (D.D.C. 2008). The defendant sought to dismiss the charge on the ground that Section 1960 only reaches those who "deal in cash or currency." Id. Firmly rejecting the argument, the E-Gold court found that it was "clear" that the text of Section 1960 reached virtual currency, as the statute "defines 'money transmitting' broadly to include transferring 'funds,' not just currency, by 'any and all means;' it is not limited to cash transactions." Id. at 88. In other words, under E-Gold's holding, "funds" includes not only traditional fiat currency, but also virtual currency, including both e-Gold and bitcoin.

The court in United States v. Faiella reached the same conclusion in a bitcoin prosecution under Section 1960, concluding that "Bitcoin clearly qualifies as 'money' or 'funds' under [the] plain meaning definitions" of the term, because "Bitcoin can be easily purchased in exchange for ordinary currency, acts as a denominator of value, and is used to conduct financial transactions." United States v. Faiella, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2013) (concluding that a bitcoin exchanger "clearly qualifies as a 'money transmitter' for purposes of Section 1960"). Following the Faiella court's lead, the court in United States v. Budovsky concluded in the Liberty Reserve case that "LR," Liberty Reserve's virtual currency, constitutes "funds" for purposes of Section 1960. See United States v. Budovsky, 2015 WL 5602853, at *14 (S.D.N.Y. Sept. 23, 2015).

*United States' Response in Opposition to Defendant's Motion to Dismiss Indictment*

*17CR3690-AJB*

*Faiella* found this reading to be consistent with the purpose of § 1960.  *See* 39 F. Supp. 3d at 545-46.  According to the statute's legislative history, Congress designed § 1960 to combat money laundering, including to deter the use of nontraditional means of converting street currency into other forms to transmit drug proceeds.  *Id.*; *accord Murgio*, 209 F. Supp.3d at 708 ("From its inception . . . , § 1960 sought to prevent innovative ways of transmitting money illicitly.").  Thus, the statute was meant to be flexible, to "keep pace with evolving threats," such as bitcoin.  *Id.*  Similarly, in *United States v. Mansy*, 2017 WL 9672554, *1 (D. Maine May 11, 2017), the court rejected defendant's argument that bitcoin was not "money" or "funds" with the meaning of § 1960 and "adopt[ed] the persuasive analysis of the majority of the district courts that have recently addressed this question."

Defendant's reliance on the magistrate judge's report and recommendation in the *Petix* case – where the judge compared bitcoin "marbles, Beanie Babies™, or Pokémon™ trading cards," p.12 -- ignores the existential difference between bitcoins and these commodities.  Dark net markets are not known to use a silver dollar as a widely accepted medium of exchange.  Nor are ransomware programs generally known to demand payment in diamonds.[2]  Unlike the "any other chattel" cited in the *Petix*

---

[2]   Ransomware refers to malicious software ("malware") that a victim usually unwittingly installs on his computer system that effectively shuts access until a ransom is paid.  This ransom is often demanded in virtual currency such as bitcoin, where extortionists leverage the anonymity conferred by this funds transfer system to make tracking the payments difficult.  *See, e.g.*, Kim Zetter, *Why Hospitals Are the Perfect Targets For Ransomware*, Wired.com, https://www.wired.com/2016/03/ransomware-why-hospitals-are-the-perfect-targets/   (last

*United States' Response in Opposition to Defendant's Motion to Dismiss Indictment*

report and recommendation, virtual currencies such as bitcoin have no intrinsic value or purpose beyond serving as a means of transferring wealth.  See United States v. Ulbricht, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) ("Indeed, the only value for bitcoin lies in its ability to pay for things—it is digital and has no earthly form; it cannot be put on a shelf and looked at or collected in a nice display case. . . . Sellers using Silk Road [on which the only accepted form of payment was bitcoin] are not alleged to have given their narcotics and malicious software away for free—they are alleged to have sold them.").[3]

Against this backdrop, the rule of lenity cited by Defendant has no application here. (See MTD Br. 13). "The Supreme Court has repeatedly stated that the rule of lenity is 'reserved . . . for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute." Faiella, 39 F. Supp. 3d at 547 (quoting Moskal v. United States, 498 U.S. 103, 108 (1990)); see also Bifulco v. United States, 447 U.S. 381, 387 (1980)). It "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding

---

visited Dec. 14, 2016) (discussing three ransomware attacks on healthcare providers in which one hospital paid $17,000 in bitcoins).

[3]      Were bitcoins so volatile, illiquid, and incapable of holding value as the Magistrate Court derides, Dkt. 36 pp.12-13, then dark net vendors would all be money-losing ventures that give away valuable goods and services for bunk.  Commerce on the markets, and common sense, show that is simply not the case.

*United States' Response in Opposition to Defendant's Motion to Dismiss Indictment*                                                                     *17CR3690-AJB*

consideration of being lenient to wrongdoers." *Callanan v. United States*, 364 U.S. 587, 596 (1961).

**C.**   **The *Petix* magistrate's narrow construction of § 1960 was erroneous.**

**1.**   **Importing a definition for "funds" as used to define "retirement funds" in the Bankruptcy Code and drawing inferences about the definition of "money" from similarly misplaced contexts are not suitable for construing § 1960.**

Rather than looking to laws that bear any meaningful relation to § 1960, the magistrate judge in <u>Petix</u> erroneously sought contextual guidance from the bankruptcy code, the judicial code, and other misplaced sources.

According to the <u>Petix</u> magistrate judge , the Supreme Court had already defined "funds" as follows: "'The ordinary meaning of 'fund[s]' is 'sum[s] of money . . . set aside for a specific purpose.'' <u>Clark v. Rameker</u>, 134 S. Ct. 2242, 2246 (2014) (ellipsis and brackets in original) (citation omitted)." <u>Id.</u> at p.8.  The Magistrate Court, however, failed to acknowledge that the context for this definition is not any criminal or regulatory anti-money laundering scheme, but bankruptcy law:

> The Bankruptcy Code does not define "retirement funds," so we give the term its ordinary meaning. See *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. ——, ——, 134 S. Ct. 1749, 1755-56 (2014). The ordinary meaning of "fund[s]" is "sum[s] of money ... set aside for a specific purpose." American Heritage Dictionary 712 (4th ed. 2000). And "retirement" means "[w]ithdrawal from one's occupation, business, or office." *Id.,* at 1489. Section 522(b)(3)(C)'s reference to "retirement funds" is therefore properly understood to mean sums of money set aside for the day an individual stops working.

<u>Clark</u>, 134 S. Ct. at 2246.

In quoting <u>Clark</u> without analyzing its reasoning, the magistrate judge missed the context that led the <u>Clark</u> court to choose its particular definition of "funds." The American Heritage Dictionary (4th ed. 2000) lists multiple definitions of "fund" and "funds." One of those definitions is "[t]he stock of the British permanent national debt, considered as public securities." <u>Id.</u> at 712. Clearly, such a definition is inapplicable to <u>Clark</u> (and to § 1960). Instead, the <u>Clark</u> court used the definition of "fund" as "[a] sum of money or other resources set aside for a specific purpose," for which the dictionary example of usage is "a pension fund." American Heritage Dictionary 712. Although "funds" may sometimes be more than simply the plural form of the singular "fund,"[4] the term "fund" as used in "pension fund" would be expected to have the same definition when used in "retirement funds." Thus, the <u>Clark</u> court chose the right definition in interpreting the Bankruptcy Code.

For that very reason, however, the <u>Clark</u> court's definition of "funds" in "retirement funds" is no precedent for the definition of "funds" in § 1960. Section 1960 refers to the transferring of "funds," not pension funds, and not retirement funds. <u>See</u> § 1960(b)(2); <u>see also</u> <u>Murgio</u>, 209 F. Supp.3d at  (distinguishing between "funds" as used in § 1960, which "clearly refers to the money or liquid assets themselves," and

---

[4]    The same dictionary has a specific definition for "funds" as "available money; ready cash," American Heritage Dictionary 712, recognizing that, depending on context, "funds" is not the same as "fund[s]." <u>See</u> 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise: words importing the singular include and apply to several persons, parties, or things; [and] words importing the plural include the singular.").

*United States' Response in Opposition to Defendant's*
*Motion to Dismiss Indictment*                                                                    *17CR3690-AJB*

"the kind of 'fund' that is comprised of a sum of assets").  By defining "funds" in an unrelated context, the <u>Clark</u> court's definition has no bearing on this case.

The magistrate judge similarly erred in defining "money" synonymously with "government-issued 'dollars' or instruments, like checks, money orders, credit cards, or notes, directly connected to dollars" based on its reading of an array of other laws.  In invoking the <u>Clark</u> definition of "funds" as "sums of money set aside for a specific purpose," the magistrate judge introduced the also-undefined term "money."  Rather than consulting the same dictionary for its definition of "money," however, the Magistrate Court simply decreed its own definition of "money."  What the Magistrate Court missed is that the primary definition of "money," according to the same American Heritage Dictionary that defined "funds," is "[a] medium that can be exchanged for goods and services and is used as a measure of their values on the market, including among its forms a commodity such as gold, an officially issued coin or note, or a deposit in a checking account or other readily liquifiable [sic] account."  American Heritage Dictionary 1135.  Thus, neither "funds" nor "money" constrains § 1960 to government-issued currency and instruments.

The Magistrate Court would have recognized such had it not ignored the statute that is sufficiently related to § 1960 to provide appropriate context.  18 U.S.C. § 1956 is as closely related to § 1960 in substance as any other criminal statute.  Entitled "laundering of monetary instruments" and commonly referred to as "money laundering," § 1956 defines "monetary instruments" as any "(i) coin or currency of the

United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery." § 1956(c)(5).

The money laundering statute, however, criminalizes more than conduct involving monetary instruments. Section 1956(a)(1) prohibits certain financial transactions involving proceeds of specified unlawful activity, for which "financial transaction" is defined to include "a transaction which in any way or degree affects interstate or foreign commerce (i) <u>involving the movement of funds by wire or other means or</u> (ii) involving one or more monetary instruments. . ." § 1956(c)(4) (emphasis added). Furthermore, the statute prohibits certain international transfers of "a monetary instrument <u>or funds</u>." § 1956(a)(2) (emphasis added). Although Congress likewise did not define "funds" in § 1956, clearly, it intended for "funds" to be different from "monetary instruments." <u>See</u> <u>Muscarello</u>, 524 U.S. at 136 (courts assume that Congress intends each term in a statute to have a "particular, nonsuperfluous meaning"). To read otherwise would be to read substantial portions of the statute into duplicity or oblivion. Thus, even if "money" were limited to government-issued currency and related instruments as per the Magistrate Court, the term "funds" is not so constrained. <u>See,</u> <u>e.g.</u>, <u>United States v. Day</u>, 700 F.3d 713, 725-26 (4th Cir. 2012) (affirming money laundering conviction in interpreting "funds" to cover physical sets of gold).

### D.      The indictment sufficiently alleges money laundering in Count 1

Defendant argues that Count 1 alleging money laundering in violation of 18 U.S.C. § 1956 should be dismissed because bitcoin is not "funds" and because bitcoin is not a coin backed by any sovereign.  Defendant also states in passing that the IRS treats virtual currency as property and not as currency.  (MTD br. at 19).  Specifically, Defendant relies upon a discussion of the term "currency" appearing in a Notice issued by the Internal Revenue Service ("IRS"). This argument is unavailing. As the court in Budovsky correctly recognized in rejecting a similar argument, "[t]hese documents are inapposite and do not suggest that the term 'funds,' " as set forth in the statutory text of Section 1960, "should not be read to encompass virtual currencies." Budovsky, 2015 WL 5602853, at *14.

Indeed, in United States v. Ulbricht, 31 F. Supp.3d 540, 569-70, (S.D.N.Y. 2014), the court gave the term "funds" in section 1956 its "ordinary meaning," finding, "Put simply, 'funds' can be used to pay for things in the colloquial sense."  Accordingly, the court found that bitcoin is funds under 1956 and held that "[o]ne can launder money using Bitcoin." Id. at 570. In short, the Ulbricht court reached the same conclusion as every federal court that has addressed the meaning of "funds" in the context of section 1960, that is, that virtual currencies are funds within the meaning of the statute.

Section 1956(a)(3)(B) proscribes conducting a "financial transaction involving property represented to be the proceeds of specified unlawful activity . . . ."  And Defendant acknowledges that "financial transaction" is defined as "the movement of

funds by wire or other means . . . ."  For the reasons stated above, bitcoin falls within the definition of funds.  This is consistent with every other federal court that has considered bitcoin in the context of section 1960 and concluded that bitcoin is "funds."

But, with respect to the money laundering charge in Count 1, whether bitcoin is "funds" is beside the point.  The property that was "represented to be the proceeds of specified unlawful activity" is the $14,500 in U.S. currency that the undercover agent sent to Defendant and which was represented to Defendant as the proceeds of the manufacture and sale of hash oil.  In <u>United States v. Panaro</u>, 266 F.3d 939 (9th Cir. 2001), the government charged defendant Cino under § 1956(a)(3)  in connection with "his acceptance of a $1,000 tribute payment mailed from Nevada to New York on November 2, 1996." <u>Id.</u> at 949.  The Ninth Circuit held:  "The evidence was also sufficient for a reasonable jury to find that by accepting the $1,000 tribute payment, [defendant] engaged in 'a financial transaction involving property represented to be the proceeds of specified unlawful activity.' [] [Defendant] engaged in a financial transaction when he accepted the $1,000 tribute payment." <u>Id.</u> at 950.  By accepting the $14,500 in cash represented to be proceeds, Defendant conducted the proscribed financial transaction.

//

//

//

//

# V.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that Defendant's motion to dismiss the indictment be denied..

DATED: August 7, 2018                     Respectfully submitted,
                                          ADAM L. BRAVERMAN
                                          United States Attorney

                                          /s/*Jonathan I. Shapiro*
                                          Jonathan I. Shapiro
                                          Assistant United States Attorney

ADAM L. BRAVERMAN
United States Attorney
JONATHAN I. SHAPIRO
Assistant U.S. Attorney
California Bar No. 268954
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619)-546-8225
Email: joshua.mellor@usdoj.gov

Attorneys for the United States

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 17CR3690-AJB |
| Plaintiff, | **CERTIFICATE OF SERVICE** |
| v. | |
| MORGAN ROCKCOONS, | |
| Defendant. | |

I, Jonathan I. Shapiro, am a citizen of the United States and am at least eighteen years of age.  My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action.  I have caused service of the **United States' Response in Opposition to Defendant's Motions to Dismiss the Indictment** on the following party by electronically filing the foregoing with the Clerk of the U.S. District Court for the Southern District of California using its ECF System.

//

//

//

//

1

David Z. Chesnoff
Richard Schonfeld

2

Counsel for defendant Morgan Rockcoons

3

I declare under penalty of perjury that the foregoing is true and correct.

4

Dated:  August 7, 2018.

5

*s/Jonathan I. Shapiro*
JONATHAN I. SHAPIRO

6

Assistant U.S. Attorney

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States' Response in Opposition to Defendant's*
*Motion to Dismiss Indictment*

*17CR3690-AJB*